**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO.   21-60086 |
| NEUTRAL POSTURE, INC., | § | |
| | § | CHAPTER 11 PROCEEDING |
| Debtor | § | SUBCHAPTER V |

**DECLARATION OF REBECCA BOENIGK IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Rebecca Boenigk declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the President and CEO of Neutral Posture, Inc., the above- captioned debtor and debtor-in-possession (hereinafter the **"Debtor"**).

2.      On November 1, 2021 (the **"Petition Date"),** the Debtor filed a petition for relief under chapter 11, **Subchapter V**, of the United States Code (the **"Bankruptcy Code"**).  The Debtor continues to operate its business and manages its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      As the President and CEO, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records.  In order to enable the Debtor to operate effectively, to smooth the transition into chapter 11, and to avoid any potential adverse effects as a result of the commencement of this chapter 11 case, the Debtor has requested various types of relief in several pleadings filed with the Court (the **"First Day Motions"**).

4.      I submit this Declaration in support of the First Day Motions and to otherwise provide the Court with the background facts of this chapter 11 case. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal

knowledge, my discussions with other management personnel of Debtor, and my review of relevant documents.  If I were called to testify, I could and would testify competently to the facts set forth herein.

## THE DEBTOR'S BUSINESS AND EVENTS
## LEADING TO THE CHAPTER 11 FILING

5.      On January 1, 1989, the Debtor was started by me in my garage.  With an initial investment of $20,000.00, I manufactured chairs and served as the sole shareholder. In January 1992, Jaye Congleton (my mother) joined the company with a $30,000.00 investment for a fifty percent ownership stake.  In 1997, the Debtor went public on the NASDAQ and remained public until 2001 when the Debtor was taken private again.

6.      During the past 30 years there have been many changes and pivots in the company all with the desired goal of efficiency, profitability and being a good corporate citizen in the community.  The Debtor started out as a bad back chair company making suitable chairs for individuals with medical issues.  The Debtor has since expanded to manufacture seating for any work situation.

7.      The Debtor acquired another seating company in 1998 and also purchased a system furniture division in 2014 as part of its strategic growth initiatives.  Currently, the product line includes everything needed for a complete office. It includes high performance, ergonomic seating; task, executive, conference and guest seating; healthcare, lab and industrial seating; specialty seating; ergonomic workplace accessories such as monitor arms, keyboard trays, antifatigue mats and footrests; sit/stand solutions; systems furniture including cubicles, worksurfaces, storage, filing, tables, conference and training room furniture; and height adjustable tables.

8.      The Debtor serves customers across the United States, Puerto Rico, Canada,

China, India and the Middle East. Customers include the federal government, state and local governments, universities, corporations and small businesses. The Debtor sells finished goods through a nationwide network of sales representatives and dealers. The Debtor's sales representatives provide a full line of services, including ergonomic assessment, training, design, delivery and installation. The Debtor's dealers provide project management, design and installation as well as quotes for our government and commercial customers. The sales representatives and dealers are an integral part of our sales plan and we would not be able to generate sales without them.

9.      The Debtor currently employs 47 individuals and puts an emphasis on being a value-added member of the Bryan/College Station community. For example, my Husband and I brought the Ronald McDonald House to Bryan/College Station and I have chaired the auction committee for 7 years. The Debtor has supported over 100 local charitable organizations and schools by either donating money or product for their auctions. The Debtor has also provided school supplies to current employees for over 20 years. The Debtor also provides paid time off for employees that are doing charitable work in the community. Many of our employees have been with the Debtor for an extended period of time and the turnover rate is much lower than the standard in the industry.

10.     I served as the auction chair for the local American Cancer Society for 6 years and raised over $1 million for them. I currently serve as the treasurer for Women Impacting Public Policy (an organization that represents over 15 million women owned small businesses). I served on the Board of Directors of the Women's Business Enterprise National Council for 11 years representing women business owners nationwide. I was appointed by the Administrator of the Small Business Administration to serve on the National Women's Business Council from 2006 to 2009. I have testified before Congress on 2 separate occasions regarding taxes on small businesses

and competition from the federal prison industry.  Finally, I was elected as the first woman president

of our industry association (the Business and Institutional Furniture Manufacturers Association)

and I still serve on the Board.

11.      The Debtor has been impacted by the global pandemic caused by COVID-

19.  Buying patterns from clients, especially corporations and government entities, changed

significantly as a result of the pandemic.  The Debtor began experiencing a decline in

customer orders in 2020 and this malaise continued until recently.

12.      This downward trend in revenue caused serious strain on the underlying

business and its ability to service its secured loans with Chase Bank.  As a result, the Debtor

initiated numerous conversations either directly or through counsel in an attempt to

restructure and amend the existing loans with Chase Bank.  All of the standalone proposals

were rejected.  The only proposal that was considered by Chase Bank was tied to a sale

leaseback transaction and unfortunately the investor walked away from the deal.

13.      On October 8, 2021, counsel for Chase Bank sent out a notice of foreclosure

related to the real estate owned by the Debtor. This notice immediately chilled the Debtor's

efforts to locate a third party investor with regard to the real estate.  If the foreclosure

proceeded, 47 individuals would be out of a job and a 33 year old company that is a valued

member of the Bryan/College Station community would cease to exist.

14.      Given the foreclosure notice the Debtor had no option but to invoke the

automatic stay protection of this Court to pursue a successful reorganization of the business

pursuant to 11 U.S. Code, **Subchapter V** – Small Business Debtor Reorganization

provisions.  The Debtor is just starting to turn the corner here and the forecast is getting

better.  Customer orders have increased recently and are trending in the right direction.

Sales for 2021will be lower than 2020 by 5%.  Many logistical and supply chain issues tied

to the pandemic still present a challenge.  The Debtor looks forward to working out a viable plan of reorganization that stabilizes the company and puts it on a path toward success for the benefit of all stakeholders.

## CAPITAL STRUCTURE OF THE DEBTOR

15.     The Debtor currently has four outstanding loans with Chase Bank with different sets of collateral: (a) a promissory note dated June 20, 2013 in the original principal amount of $1,280,000, as amended from time to time, with a first priority lien deed of trust on real estate and a lien on personal property; (b) a promissory note dated June 20, 2013 in the original principal amount of $1,500,000, as amended from time to time, with a fifth priority position lien deed of trust on the real estate and a lien on the personal property of the Debtor; (c) a promissory note dated March 30, 2015 in the original principal amount of $1,000,000, as amended from time to time, with a lien on personal property; and (d) a promissory note dated April 9, 2015 in the original principal amount of $500,000, as amended from time to time, with a lien on personal property.  These loans are guaranteed personally by me and my mother. Approximately 2 years ago, Chase Bank requested that the Debtor move its accounts outside of Chase Bank.  As a result all of the Debtor's cash as of the petition date is deposited with Amarillo National Bank and Chase Bank does not have a deposit account control agreement in place.

16.     The Debtor also has three loans secured by a second, third and fourth lien on the real estate with T2W, LLC in the original principal amounts of $1,250,000.00.

17.     The Debtor also has a loan outstanding in the principal amount of $500,000.00 tied to the COVID-19 Economic Injury Disaster Loan program implemented by the U.S Small Business Administration.

18.    As of the petition date, the Debtor owed approximately $1,250,000 to vendors and third-party providers incurred in the ordinary course of its business.

## FIRST DAY MOTIONS AND ORDERS

19.    The First Day Motions seek relief to allow the Debtor to meet necessary obligations and fulfill its duty as a debtor in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and best serves the Debtor's estate and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.   Below is an overview of each of the First Day Motions. The Debtor requests emergency consideration of the following first day motions.  I believe that based on the Debtor's urgent need to continue operations during this case, emergency consideration of such motions is warranted.

20.    **Cash Management Motion**.   The Debtor manages its cash, receivables, and payables through a centralized cash management system (the **"Cash Management System"**). The  Cash  Management  System utilizes the following bank accounts all held with Amarillo National Bank (the **"Bank Accounts"**):

|    | Account Name | Account Number |
|----|--------------|----------------|
| 1. | **Operating Account** | XXXX3044 |
| 2. | **Payroll Account** | XXXX6327 |

21.    The Cash Management System in place facilitates cash monitoring, forecasting, and reporting and enables the Debtor to collect, transfer and disburse funds generated from operations. Any disruption of the Cash Management System would be

materially detrimental to the Debtor's operations. For example, the operating account serves as an automatic depository account to receive payments from the federal government for customer orders and the Debtor needs continuity in this regard to maintain cash flow from the federal government.  Any change in this relationship would cause a significant delay in receipt of payments from customers such as the federal government.

22.     The Debtor's cash management system constitutes an ordinary course and essential business practice providing significant benefit to the Debtor.  The Debtor's continued use of their cash management system without interruption is vital to the Debtor's business operations and the success of this chapter 11 case.  As a result, I respectfully submit that the relief requested in the cash management motion is in the best interests of the estate and should be granted.

23.     The Debtor has two Canadian bank accounts, which receive funds from Canadian customers.  The Debtor intends to close these Canadian bank accounts.

24.     The Debtor intends to open another bank account at an authorized depository to be act as the debtor in possession account.

25.     **Cash Collateral Motion**.  It is my understanding that Chase Bank asserts a lien on all of the Debtor's property and the rents derived therefrom pursuant to two deeds of trust and certain security agreements executed in connection with the four outstanding loans.  However, Chase Bank does not have a deposit account control agreement and the cash collateral accounts are not residing at Chase Bank.

26.     By the cash collateral motion, the Debtor seeks authority, to the extent necessary and applicable, to use cash collateral of Chase Bank during the interim period on a limited basis and solely to the extent needed to maintain and operate the business in the ordinary course pursuant to the cash collateral interim budget.

27.     The Debtor has an immediate and ongoing need to use cash collateral to, among

other things, satisfy payroll and other valid working capital and general corporate needs to maintain the value of the enterprise and to ensure a chance for a successful Subchapter V reorganization. In return, Chase Bank will receive the adequate protection as provided for in the interim order approving the use of cash collateral.

28. **Employee Wage Motion**. The Debtor currently has 47 employees all of whom are owed some amount for services provided prepetition for the two-week payroll period immediately preceding the petition date. As an employer, Debtor also provides certain benefits to its employees including paid time off, access to the Health Benefits Plan, and a 401(k) plan. To give Debtor the best chance at transitioning into chapter 11, Debtor asks for authority to pay any outstanding amounts relating to pre-petition services as provided in the Prepetition Wage Motion. Debtor also asks for authority to maintain the benefits programs post-petition.

29. 28 employees are hourly and 19 employees are paid on a salary basis. None of the employees are party to a collective bargaining agreement or union or similar labor agreements. Absent authorization to keep these payments current to employees the Debtor is at risk of significant employee attrition as the unpaid employees may seek alternative opportunities. The loss of employees who are the lifeblood of the operations at our facility would hinder the Debtor's ability to meet their obligations, fulfill existing customer orders and would likely diminish the Debtor's ability to carry out its Subchapter V filing strategy and successfully reorganize. I respectfully submit that the relief requested in the employee wage motion is in the best interests of the estate and should be granted.

30. **Utilities Motion**. The Debtor incurs expenses in the ordinary course of its business for, among other things, electricity, natural gas, water and telecommunications. The Debtor makes utility payments directly to a utility provider and preserving such

services on an uninterrupted basis is essential to the Debtor's ongoing operations.  Based on a monthly average for the last 12 months prior to the petition date, the Debtor estimates that its aggregate cost of utility services for the next 30 days will be approximately $6,000.00.

31.     To provide additional adequate assurance of payment the Debtor proposes to fund an adequate assurance deposit of $4,380.00 in a newly created segregated deposit account at the Amarillo National Bank owned by the Debtor for the benefit of the utility companies.  If the adequate assurance procedures are not approved, the Debtor will likely be confronted with and forced to address requests by their providers at a critical time for its business.  I understand that the utility providers could unilaterally decide that they are not adequately protected and therefore may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtor altogether.  Such an outcome could seriously jeopardize the Debtor's operations and its ability to maximize the value of its estate.  I respectfully submit that the relief requested in the utilities motion is in the best interests of the estate and should be granted.

32.     **<u>Critical Vendor Motion</u>**.  The Debtor relies on essential suppliers to provide specialized product and inventory that goes into the manufacturing process of finished goods. In some instances the supplier is the only available source for such product due to the highly specialized nature of such material. In other instances the suppliers are the most preferred source from which the Debtor can procure such goods within a timeframe and at a price that will permit the Debtor to continue to operate its business smoothly and effectively.  This is even more critical in today's time frame given the global pandemic's negative impact on the supply chain and the ability to move inventory and product quickly and efficiently to keep the manufacturing process on time.

33.     In narrowing the list of suppliers to only those that are truly critical the Debtor and its advisors have engaged in a comprehensive process reviewing and analyzing the Debtor's books and records, consulting with personnel responsible for operations, reviewing past practices and evaluating other alternatives.  Further the Debtor proposes to condition payment of a critical vendor on a binding requirement to continue to provide new services to the Debtor on mutually agreed upon terms post-petition as set forth in the order granting such relief.

34.     In addition, the Debtor has a network of independent salespersons and dealers who interface with customers and generate new customer orders.  It is critical that these individuals who are part of the business going forward get paid for their results achieved. Absent payment these sales representatives may shift their focus to a competitor product and otherwise inject negativity toward the Debtor in the marketplace.

35.     Given the importance of the goods and services provided by certain suppliers and customer orders generated by the sales representatives and dealers, I believe that the payment to such suppliers, sales representatives and dealers is necessary, appropriate and in the best interests of the Debtor and the estate.  Therefore, I respectfully submit that the relief requested in the critical vendor motion should be granted.

## CONCLUSION

36.     I RESPECTFULLY REQUEST THAT THE COURT GRANT ALL RELIEF REQUESTED IN THE FIRST DAY MOTIONS, ALONG WITH ANY AND ALL OTHER AND FURTHER RELIEF THAT THE COURT MAY DEEM TO BE JUST AND PROPER.

37.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of November, 2021.

By: */s/ Rebecca Boenigk*
**Rebecca Boenigk**
President & CEO
Neutral Posture, Inc.

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was served on November 2, 2021 upon all parties requesting notice via Court's ECF System.

*/s/ Eric B. Terry*
Eric B. Terry